WICHITA AND AFFILIATED TRIBES
OF OKLAHOMA, Appellant

v.

Donald P. HODEL, Secretary,
Department of Interior, et al.

WICHITA AND AFFILIATED TRIBES
OF OKLAHOMA

v.

Donald P. HODEL, Secretary,
Department of Interior, et al.

Appeal of CADDO TRIBE OF
OKLAHOMA, Appellant.

Nos. 85–5306, 85–5347.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 13, 1986.

Decided April 18, 1986.

As Amended April 18, 1986.

Patricia L. Brown, Indianapolis, Ind., for appellant in No. 85–5306, Wichita and Affiliated Tribes of Oklahoma.

John A. Bryson, Atty., Dept. of Justice, with whom Dirk D. Snel, Atty., Dept. of Justice, Washington, D.C., was on brief, for appellees in Nos. 85–5306 and 85–5347, Dept. of Interior, et al.

Rodney J. Edwards, Duluth, Minn., for appellee in No. 85–5306 and appellant in No. 85–5347, Caddo Tribe of Oklahoma.

Jap W. Blankenship, Oklahoma City, Okl., was on brief, for appellee in No. 85–5347, Delaware Tribe of Western Oklahoma.

Before WALD, SCALIA, and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case deals with a 1963 Department of the Interior order restoring land to an Indian tribe that no longer existed in its original form, but which had been succeeded by three separate tribes. For approximately 15 years the three tribes were able to agree that each tribe would withdraw approximately equal amounts from the fund representing the income from the land. After that agreement broke down in the late 1970s, the Interior Board of Indian Appeals ("IBIA") held that the proceeds of the land, which the government holds in trust for the tribes, should be distributed to each tribe according to its relative population as of the time that funds accrue. *Delaware Tribe of Western Oklahoma v. Acting Deputy Assistant Secretary—Indian Affairs (Operations)*, 10 I.B.I.A. 40 (1982). The Wichita and Affiliated Tribes of Oklahoma ("Wichitas") challenge this ruling, arguing that the three tribes should receive equal distributions notwithstanding their disparity in size. The largest of the three tribes, the Caddo Tribe of Oklahoma ("Caddos"), challenges the IBIA's decision that income distributions made from 1966 until the time of the IBIA decision should not be retroactively reallocated. The Caddos argue that since the government breached its fiduciary duties in wrongfully distributing past funds, it should make future distributions in such a way as to compensate the Caddos for lost income over this period. Finally, the Wichitas challenge the Assistant Secretary of Indian Affairs' ("Assistant Secretary") decision implementing the IBIA ruling. In that decision, the Assistant Secretary announced that the tribal population figures would be assessed as of the date of the IBIA decision, with no future readjustments. The United States District Court for the District of Columbia granted the government's motion for summary judgment on all three claims.

We affirm the District Court's award of summary judgment rejecting the Wichitas' claim that the population-based distribution scheme ordered by the IBIA was arbitrary,

capricious, or contrary to law. We vacate the District Court's award of summary judgment, however, on the Caddos' claim for retroactive relief. That claim should have been dismissed under Federal Rule of Civil Procedure 19(b) because the Wichita and Delaware tribes were indispensable parties who could not be joined because of their tribal immunity, which they never waived with regard to the cross-claim. Lastly, we reverse the District Court's award of summary judgment for the government with respect to the Wichitas' claim that the Assistant Secretary acted improperly in deciding not to undertake future periodic readjustments of population figures. The District Court is instructed to order the Department to develop a plan for assessing current population that is consistent with the IBIA decision.

## I. BACKGROUND

### A. *Historical Backdrop*

In 1859, the United States settled a number of Indian tribes on a site located in the Washita River in the Indian Territory, in what is now the State of Oklahoma. The site, commonly known as the Wichita Reservation, had originally been leased from the Choctaw and Chickasaw nations. *See generally Caddo Tribe of Oklahoma v. United States*, 614 F.2d 272, 273–74, 222 Ct.Cl. 306 (1980) (discussing history of the settlement). For some time after their settlement, the tribes on the Wichita Reservation were known as the Wichita and Affiliated Bands of Indians (hereinafter "Affiliated Bands").

On June 4, 1891, the Affiliated Bands entered into an agreement with the United States (commonly known as the Jerome Agreement) whereby they agreed to cede "all their claim, title and interest in and to the lands" comprising the Wichita Reservation. In return, each individual Indian was to receive an allotment of 160 acres of land, and a proportionate payment out of whatever surplus remained after certain reserves were set aside for various public purposes. Congress ratified the Jerome

Agreement on March 2, 1895. 28 Stat. 876, 894–98.

During the 1930's, United States policy began to turn away from the assimilationist ideal that underlay the practice of allotting reservation lands to individual Indians, and toward a policy of strengthening Indian tribal organizations. *See generally* F. Cohen, *Handbook of Federal Indian Law* 183–87 (2d ed. 1982); V. Deloria & C. Lytle, *American Indians, American Justice* 12–15 (1983). This new policy culminated in 1934 with Congress' enactment of the Indian Reorganization Act ("IRA"), which, among other things, authorized the Secretary of the Interior "to restore to tribal ownership the remaining surplus lands of any Indian reservation" then in existence. 25 U.S.C. § 463. The lands that would be restored were to be held in the name of the United States as trustee for the tribe. 25 U.S.C. § 465.

### B. *The 1963 Restoration Order*

In 1963 the Secretary of the Interior determined that 2,306.08 acres of land that until then had been reserved for public uses should be restored to the Affiliated Bands' tribal ownership under the IRA. In restoring the lands, however, he faced a problem of determining to which tribes the restoration should be made. The Affiliated Bands had long since ceased to exist as a single entity. Its three successor tribes, all parties to this suit, were the Wichitas, the Caddos, and the Delaware Tribe of Western Oklahoma ("Delawares"). Taking this into account, the order restored the lands *"for the use and benefit of the Wichita and Affiliated Bands of Indians (Caddo Tribe and the Absentee Band of Delaware Indians of Caddo County, Oklahoma)."* 28 Fed.Reg. 10157–58 (Sept. 17, 1963) (emphasis added).[1]

Even before the restoration order in 1963, questions about the distribution criteria among the three tribes had been raised within the Department. Four months be-

---

**1.** Subsequent smaller restorations have also been made using this same language. *See, e.g.,*

38 Fed.Reg. 16065 (June 20, 1973) (50.93 acres); 47 Fed.Reg. 11282 (Mar. 16, 1982) (58.13 acres).

fore the order was issued, a letter from the Assistant Secretary of the Interior for Indian Affairs to another Department official, set forth the Department's view on this issue:

The authorization of restoration ... contemplated that the land would be restored to the Wichita Band and Affiliated Bands as one group so that each member of the Wichita Band, Caddo Tribe and Absentee Band of Delaware Indians will share equally in the benefits to be derived therefrom.

In order to effectively manage this property, it is expected that the three groups will jointly form an entity acceptable to the Secretary of the Interior, and legally capable under the state law of holding, managing and disposing of real property.

The Director, Bureau of Land Management, is being instructed, by copy of this letter, to prepare the restoration order in such a manner as to clearly indicate that the land is being restored to the Wichita and Affiliated Bands as one group.

Letter to Anadarko Area Director from Assistant Secretary Petner, dated May 31, 1963, *reproduced in Delaware Tribe of Western Oklahoma v. Acting Deputy Assistant Secretary—Indian Affairs*, 10 I.B.I.A. 40, 42 (1982); Joint Appendix ("J.A.") at 31.

C. *Management System and Distribution of Funds*

In 1964, the three tribes formed an Inter-Tribal Land Management Committee to manage the land and the income it produced. The tribes were equally represented on this Committee. From 1966, when the land first produced income, until 1970, all withdrawals were made through orders of the Land Management Committee and monies were distributed equally to all three tribes. The withdrawals for this period totalled $3025 per tribe.

By 1970, the Caddos, who were by far the largest of the tribes, had grown disenchanted with the equal distribution scheme. In September, 1970, the Department of the Interior's Field Solicitor in Oklahoma, in response to an inquiry from the Caddos, wrote that he interpreted the restoration order as contemplating "that the responsibility of management and the sharing of benefits would be upon the basis of the individual members of the three tribal groups and not upon a basis of tribal equality." Notwithstanding this interpretation, the Solicitor explained that the Department had been satisfied with the tribes' own decision to split the income equally and would continue to "go along with any arrangement that is mutually agreeable to the three tribes." Letter from Lyle R. Griffis, Field Solicitor, Anadarko, to Secretary of Caddo Indian Tribe, dated Sept. 10, 1970, Admin.Rec. No. 31, ex. F.

In 1970, the Land Management Committee was dissolved. Since that date management of land has been conducted by the tribal councils of each tribe acting separately to approve all decisions with respect to the land. Under that system the tribes continued to divide the income through 1977 on the basis of one-third for each tribe. During the 1970–77 period each tribe received $59,800.

Throughout the post-1970 period, the Caddos have made periodic efforts to achieve a different distribution system that would take advantage of their larger membership. In 1972, the Commissioner of Indian Affairs, after meeting with a group of Caddos, wrote that he agreed that the proceeds should be distributed on a per capita basis. Letter from Louis R. Bruce, Commissioner of Indian Affairs to Area Director, Anadarko Area, dated Oct. 4, 1972.

The Caddos brought the issue to a head in 1979 by passing annual resolutions expressing their non-acquiescence in the equal distribution approach. In February, 1980, the Deputy Assistant Secretary for Indian Affairs informed the tribes that, pending resolution of the dispute, each tribe would be allotted $10,000 from the fund annually. Admin.Rec. No. 9. On August 5, 1981, after soliciting comments from the three tribes, the Assistant Secretary announced that the Department had

decided to apportion income on the basis of relative population as of 1891, the date the lands were originally ceded through the Jerome Agreement. Such apportionment would give the Caddos 51.13%, the Wichitas 39.96%, and the Delawares 8.91% of the funds.[2] The Assistant Secretary announced that this decision would be applied retroactively to 1963, the date of the initial restoration, and that future distributions would reflect the past overpayments. *See* Memorandum Decision of Acting Deputy Assistant Secretary—Indian Affairs (Operations), dated Aug. 5, 1981, Admin.Rec. No. 31, ex. H.

The Delaware Tribe, obviously the odd man out under the Assistant Secretary's decision, appealed to the IBIA. The Delaware Tribe argued that the division should be made on current population figures (rather than 1891 figures) and that it should not be applied retroactively to the distributions already made. The Wichitas intervened, arguing that the 1891 date was appropriate, or, alternatively, that equal division should be continued. The Caddos also intervened, arguing that the Assistant Secretary correctly decided to use 1891 figures and to apply them retroactively.

### D. *The IBIA Decision and its Implementation*

On July 30, 1982, the IBIA issued its decision, reversing the Assistant Secretary's 1981 plan. *Delaware Tribe of Western Oklahoma v. Acting Deputy Assistant Secretary—Indian Affairs*, 10 I.B.I.A. 40 (1982), *reprinted in* J.A. at 29. Finding that the purpose of the Indian Reorganization Act was to "address current problems of existing tribes," 10 I.B.I.A. at 48, the Board held that use of the 1891 date for apportionment was improper: "the purpose of the IRA was not to return tribes of Indians to the position in which they found

themselves at the end of the 19th century . . . [it was] to invigorate existing tribal governments." *Id.* at 49–50. The Board found that the meaning of the restoration orders, as supported by contemporaneous interpretations by Department of the Interior officials, was that "the three existing tribes were to share in income from restored land in proportion to tribal enrollments of members and for the benefit of living tribal members." *Id.* at 52. Thus, the Board concluded, "division of current and future funds should be based upon the *current relative populations of each tribe at the time the funds accrue.*" *Id.* (emphasis added). Beyond those instructions, the Board declined to "fashion a plan for ascertaining the exact populations of each tribe," on the ground that devising the details of such a plan would exceed its jurisdiction which is limited to deciding purely legal questions. *Id.* at 55–56. On the retroactivity issue, the Board found that since the tribes had acquiesced in the equal distribution scheme, previous allotments made to the tribes should not be disturbed. *Id.* at 54.

To implement the Board's decision, the Assistant Secretary approved a plan of distribution based on the tribes' population figures as of January 1, 1982. The plan provided that every three years the population figures would be readjusted and distributions of current income would be made in accordance with the most recent figures.[3] Letter from Deputy Assistant Secretary—Indian Affairs to Anadarko Area Director, dated Jan. 17, 1983, J.A. at 81.

Before the Assistant Secretary's plan was implemented, the Wichitas filed action in the United States District Court for the District of Columbia seeking review of the IBIA decision and the Department's distribution scheme. The Wichitas again argued

---

**2.** A report of the Commissioner of Indian Affairs, dated October, 1891, showed the total population of the three tribes at 1,066. Of these, 426 were Wichitas, 545 were Caddos, and 95 were Delawares.

**3.** The Assistant Secretary left open the possibility that if it became evident that the membership

lists were resulting in a patently unfair distribution scheme, for example, if one tribe was changing its membership criteria so as to inflate its population, the Secretary might exercise his authority to make equitable adjustments in the distributions. J.A. at 82.

that the funds should be distributed as of the 1891 date, or alternatively, on an equal basis to the three tribes. On September 7, 1983, while the District Court action was pending, the Assistant Secretary announced a new plan whereby all distributions would henceforth be based on the population figures as of July 30, 1982, the date of the IBIA decision. There would be no periodic population readjustments thereafter. J.A. at 76–77. This plan would permanently set the Caddos' share at 56.2%, the Wichitas' share at 24%, and the Delawares' share at 19.8%.[4] The Assistant Secretary also authorized the distribution of $440,000 to be divided unequally among the tribes, based roughly on relative population percentages. This distribution was explicitly made subject to adjustment at the conclusion of the litigation.

The Caddos and the Delawares meanwhile moved to intervene as party defendants in the District Court suit, claiming that they were indispensable parties to the litigation. After the District Court allowed both tribes to intervene, the Caddos brought a cross-claim against the government arguing that the IBIA decision erroneously deprived them of their right to retroactive payments.

### E. The District Court Decision

On review, the District Court granted the government's motion for summary judgment, affirming the IBIA's and Assistant Secretary's decisions in all respects. *Wichita and Affiliated Tribes of Oklahoma v. Clark*, Civ. Action No. 83–0602 (D.D.C. Jan. 25, 1985). Rejecting the Wichitas' main claim that the distribution should be based on the relative tribal membership as of 1891, or be divided on an equal basis, the District Court found that the IBIA had correctly discerned the purposes of the Indian Reorganization Act and had reached a rational decision in favor of current, population-based distribution. *Id.* at 18–21. As for the Caddos' cross-claim for retroactive relief, the court was unpersuaded by the Caddos' argument that the withdrawals from the fund were merely advances, and thus upheld the IBIA's determination that there should be no retroactive readjustment. *Id.* at 21–22. Finally, the court credited the government's contention that periodic readjustments would encourage membership criteria changes and disputes, *id.* at 23, and found that the Assistant Secretary's "final plan is in complete accordance with the IBIA decision," *id.* at 24, and was "not otherwise arbitrary, capricious, or contrary to law." *Id.* at 25. The Wichitas and Caddos both appeal the District Court's issuance of summary judgment for the government on their claims.

### II. JURISDICTIONAL AND EQUITABLE LIMITATIONS

### A. Tribal Immunity and Joinder of Indispensable Parties

The Wichitas have continuously asserted that because the Caddos' cross-claim for adjustments is to be taken out of the Wichitas' and Delawares' future allocations, it is barred by tribal immunity.[5] The Wichitas are correct in asserting that tribal immunity is an issue in this suit. The doctrine of tribal immunity, which recognizes the sovereignty of Indian tribes and seeks to preserve their autonomy, protects tribes from suits in federal and state courts. *See United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 656–57, 84 L.Ed. 894 (1940). At the threshold, tribal immunity does not extend to barring suit against a third, non-immune party solely because the effect of a judgment against the third party will be felt by the tribe. Nonetheless, tribal immunity quickly surfaces as a crucial issue in such a suit since if the tribe is an indispensable party, and cannot be joined due to its immunity, the claim may not proceed. *See, e.g., Lomayaktewa v. Hathaway*, 520 F.2d 1324 (9th Cir.1975)

---

4. The total population of the three tribes was 4870. Of these, 2737 were Caddos, 1169 were Wichitas, and 964 were Delawares.

5. *See* Wichita Reply Brief at 12–13; Plaintiffs' Motion for Summary Judgment and Points and Authorities in Support Thereof at 37–40.

(dismissing suit because tribe was indispensable party), *cert. denied,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976); *Tewa Tesuque v. Morton,* 498 F.2d 240 (10th Cir.1974) (same), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975). Therefore, we must consider whether all the interested tribes in the case were actually parties, and if not, whether they were indispensable so that the claims should not have proceeded in their absence.[6]

### B. *Waiver and Intervention*

#### 1. *The Wichitas' Suit Against the Department*

In the Wichitas' original claim against the government, the Caddos and Delawares were in fact parties to the suit. They chose to intervene voluntarily as party defendants to the Wichitas' action. *See* Motion of the Delaware Tribe of Western Oklahoma to Intervene (filed August 8, 1983), Record No. 7; Motion of Caddo Tribe of Oklahoma to Intervene as Defendant (filed September 19, 1983), Record No. 16.

An argument could be made, of course, that notwithstanding their voluntary intervention in the suit, the Caddos and Delawares were not within the court's jurisdiction because of their tribal immunity. Although it is universally agreed that Congress may pierce tribal immunity through congressional action, *see Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978), there has been some question as to the tribes' own ability to waive immunity through voluntary participation in a suit. *See* Note, *In Defense of Tribal Sovereign Immunity,* 95 Harv.L.Rev. 1058, 1060 n. 20 (1982) (discussing view that tribes may not waive immunity without explicit congressional authority).

In a well-reasoned opinion, the Ninth Circuit Court of Appeals decided that both

Supreme Court precedent and clear policy considerations "militate in favor of the tribe's power to consent to suit." *United States v. State of Oregon,* 657 F.2d 1009, 1014 (9th Cir.1981) (citing *Turner v. United States,* 248 U.S. 354, 358, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919); *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 173, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977)). The court pointed out that the right to consent to suit is consistent with the broad notion of Indian self-determination, and that an opposite holding might deter others from entering contracts with Indian tribes. *State of Oregon,* 657 F.2d at 1014. At least three other circuits, one of which was affirmed by the Supreme Court, have also accepted the premise that tribes may consent to suit. *See Merrion v. Jicarilla Apache Tribe,* 617 F.2d 537, 540 (10th Cir.1980) (en banc), *aff'd,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); *Fontenelle v. Omaha Tribe of Nebraska,* 430 F.2d 143, 147 (8th Cir.1970); *Maryland Cas. Co. v. Citizens' National Bank,* 361 F.2d 517, 520–21 (5th Cir.), *cert. denied,* 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966).

We adopt the determination of these four circuits that Indian tribes may consent to be sued, recognizing, as they did, that there is some language in Supreme Court cases that might support a contrary conclusion. Specifically, in its 1940 opinion in *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940), the Court explained, in dictum, that it is a "corollary to immunity from suit on the part of the United States and the Indian Nations in tutelage that this immunity cannot be waived by officials. If the contrary were true, it would subject the Government to suit in any court in the discretion of its responsible officers." *Id.* at 513, 60 S.Ct. at 657.[7]

---

**6.** We read the Wichitas' tribal immunity argument as encompassing the indispensable party claim. But even if no party raised the issue, we have an independent duty to raise it *sua sponte. See Weisberg v. United States Department of Justice,* 631 F.2d 824, 829–30 & 830 n. 40 (D.C.

Cir.1980); 3A Moore's Federal Practice ¶ 19–19, at 19–296–300 (1984).

**7.** While this statement was clearly *dicta,* since the Court surely would not have found a waiver through the tribe's failure to object to jurisdiction, it does nonetheless merit our attention.

Examination of language in subsequent Supreme Court cases, however, indicates that the Court has stepped back from that broadly worded assertion. In *Puyallup Tribe v. Washington State Dep't*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), the Court rejected an argument that tribal immunity had been waived, explaining that "[r]espondent does not argue that *either the tribe or Congress* has waived its claim of immunity or consented to the entry of an order against it.... The mere fact that the Tribe has appeared on behalf of its individual members does not effect a waiver of sovereign immunity for the Tribe itself." *Id.* at 173, 97 S.Ct. 2621 (emphasis added). The implication of that statement is that a tribe may indeed consent to be sued.[8] *See also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (affirming merits of 10th Circuit's decision without questioning its determination that jurisdiction vested because tribe consented to suit).

This apparent shift in the Court's position away from the stance of *United States Fidelity* makes sense in view of the changing notions of increased tribal autonomy.[9] *See generally* V. Deloria & C. Lytle, *American Indians, American Justice* 21–24 (1983) (discussing change of direction in Indian policy in post-1961 period).

■ Conceding, then that the question of voluntary waiver of tribal immunity is "presently an unclear area of the law," *Tribal Sovereign Immunity*, 95 Harv.L. Rev. at 1073, we throw our hat in with our sister circuits, and an approach that emphasizes tribal autonomy in the courts. In holding that a tribe may consent to be

sued, it is imperative to caution, however, that such consent "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. at 1677.

■ There can be no doubt that the Caddos' and Delawares' voluntary intervention as party defendants was an express waiver of their right not to be joined in the Wichitas' suit. *See United States v. State of Oregon*, 657 F.2d 1009, 1014 (9th Cir.1981). Unlike a situation where a tribe enters a suit as a plaintiff, anticipating that it can only improve or maintain its *status quo*, a tribe intervening as a defendant fully realizes that it might lose that which it already has—preserving its *status quo* is the whole point of the intervention. By so intervening, a party "renders itself 'vulnerable to complete adjudication by the federal court of the issues in litigation between the intervenor and the adverse party.'" *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C.Cir.1985) (quoting *State of Oregon*, 657 F.2d at 1014); *see also District of Columbia v. MSPB*, 762 F.2d 129, 132 (D.C.Cir.1985).

### 2. *The Caddos' Cross-Claim Against the Department*

■ There has, however, been no such explicit consent by the Wichitas to litigate the Caddos' cross-claim in federal court. A tribe does not automatically open itself up to counterclaims simply by virtue of filing a suit. An Indian tribe's immunity is co-extensive with the United States' immunity, *see United States Fidelity*, 309 U.S. at 514, 60 S.Ct. at 657, and neither loses that immunity by instituting an action,

---

**8.** The fact the Supreme Court did not speak about tribal authority to consent in its 1978 opinion in *Santa Clara Pueblo* is not disturbing. There, the tribe vehemently contested jurisdiction, and the only issue was whether Congress had explicitly waived tribal immunity through statute. The Court's quotation of *United States Fidelity* to the effect that "'without Congressional authorization' the 'Indian Nations are exempt from suit,'" 436 U.S. at 58, 98 S.Ct. at 1677, must be taken in the context that the issue of tribal authority to waive immunity was not an issue before the Court.

**9.** The 10th Circuit has stated that:

We see no reason in principle or in law to conclude a tribe that has taken advantage of Congress' encouragement to organize for purposes of providing for its common welfare under 25 U.S.C. § 476, has adopted a constitution, and has formally attempted to waive its sovereign immunity ... may not do so.

*Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537, 540 (10th Cir.1980) (en banc), *aff'd*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

even when the defendant files a compulsory counterclaim. *See id.* at 513, 60 S.Ct. at 657; *Ramey Construction Co. v. Apache Tribe of Mescalero Reservation,* 673 F.2d 315, 319–20 (10th Cir.1982), and cases cited therein. Nor did the Wichitas' responsive filings in the District Court and in this court to the issues raised by the Caddos' cross-claim constitute a waiver of immunity. Throughout the proceedings, the Wichitas continued to assert that the cross-claim was not properly before the District Court because of their tribal immunity. *See supra* note 5.

Since the Wichitas did not voluntarily become a party to the cross-claim, and could not have been made a party against their will, we must now decide whether they were indispensable parties to the cross-claim.

## C. *Indispensable Party Analysis*

Federal Rule of Civil Procedure 19(a) provides that, among others, a person or entity who "claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may ... as a practical matter impair or impede his ability to protect that interest" shall be joined in the action, if feasible. There is no doubt that the Wichitas and the Delawares so qualify in this case. As beneficiaries of the trust who stand to lose if the Caddos succeed in obtaining redistributions of future income to compensate for the past, the Wichitas certainly have a vital interest in being parties to the cross-claim, and especially in retaining the ability to appeal any adverse judgment.

▮ Nonetheless, inability to join a party who meets the criteria in Rule 19(a) is not necessarily fatal. Rather, Rule 19(b) provides that if such a person "cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." In applying this somewhat amorphous standard, the rule instructs the court to consider, among other things, the following four factors:

first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate remedy if the action is dismissed for nonjoinder; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b). These four factors are not rigid, technical tests, but rather "guides to the overarching 'equity and good conscience' determination." *Cloverleaf Standardbred Owners v. National Bank,* 699 F.2d 1274, 1279 n. 11 (D.C.Cir. 1983). Surveying these factors and applying this "overarching" standard, we conclude that the Wichitas and Delawares were indeed indispensable parties to the Caddos' cross-claim that asked for retroactive redistributions. In their absence, the cross-claim should have been dismissed.

### 1. *Extent of Prejudice*

Conflicting claims by beneficiaries to a common trust present a textbook example of a case where one party may be severely prejudiced by a decision in his absence. *See Williams v. Bankhead,* 86 U.S. (19 Wall.) 563, 570–71, 22 L.Ed. 184 (1874); *Russell v. Clark's Executors,* 11 U.S. (7 Cranch) 69, 98–99, 3 L.Ed. 271 (1812) (Marshall, C.J.); *see generally* 3A Moore's Federal Practice ¶ 19.08 at 19–165 (1984), and cases cited therein ("Where the purpose of the suit is the disposition of a fund, a trust, or an estate to which there are several claimants, all of the claimants are generally indispensable.").

▮ In some cases the prejudice created by the relevant party's absence is mitigated, or even eliminated, by the presence of a party who will represent the absent party's interest. In *Heckman v. United States,* 224 U.S. 413, 32 S.Ct. 424,

56 L.Ed. 820 (1912), for example, the Supreme Court held that Indian grantors of land were not indispensable parties in a suit brought by the United States to cancel those conveyances and to restore the land to the Indian grantors. The Court explained that "[t]here can be no more complete representation than that on the part of the United States in acting on behalf of these dependents.... When the United States instituted this suit, it undertook to represent the Indian grantors whose conveyances it sought to cancel." *Id.* at 444–45, 32 S.Ct. at 434. In this case, by contrast, the United States[10] is apparently willing to concede a large portion of the Caddos' claim for retroactive relief.[11] Moreover, whatever allegiance the government owes to the tribes as trustee, is necessarily split among the three competing tribes involved in the case. This case, therefore, falls squarely under the rule that when "there is a conflict between the interests of the United States and the interests of Indians, representation of the Indians by the United States is not adequate." *Manygoats v. Kleppe,* 558 F.2d 556, 558 (10th Cir.1977); *see also New Mexico v. Aamodt,* 537 F.2d 1102, 1106 (10th Cir. 1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *Hansen v. Peoples Bank of Bloomington,* 594 F.2d 1149 (7th Cir.1979).

▮ Because of the Wichitas' intimate participation in the litigation surrounding their original claim they have, of course, had ample opportunity to make known their interests and legal theories about the cross-claim to both the District Court and this court. Nonetheless, we decline to hold

that the *de facto* opportunity to file position papers with the court on a cross-claim is sufficient to mitigate the prejudice of non-joinder. If the opportunity to brief an issue as a non-party were enough to eliminate prejudice, non-joinder would never be a problem since the court could always allow the non-joinable party to file amicus briefs. Being party to a suit carries with it significant advantages beyond the amicus' opportunities, not the least of which is the ability to appeal an adverse judgment. *See Bender v. Williamsport Area School District,* —— U.S. ——, ——, 106 S.Ct. 1326, 1332, 89 L.Ed.2d 501 (1986) (even though appellant was a party to the district court suit in his official capacity, he could not appeal judgment in his individual capacity since he had not intervened as a defendant in his individual capacity); *Moten v. Bricklayers, Masons & Plasterers International Union,* 543 F.2d 224, 227 (D.C.Cir.1976) (" 'It has long been settled that one who is not a party to a record and judgment is not entitled to appeal therefrom.' ") (quoting *United States v. Siegel,* 168 F.2d 143, 144 (D.C.Cir.1948)); *see also Washoe Tribe of Nevada & California v. Greenley,* 674 F.2d 816, 818 (9th Cir.1982) (one who was not a party of record may not typically appeal judgment).

Furthermore, the Wichitas' filings with regard to the cross-claim all occurred *after* the Wichitas asked the District Court to dismiss the case for lack of jurisdiction due to tribal immunity. The District Court never ruled on this issue. It would be manifestly unjust to punish the Wichitas for hedging their bets thereafter by seeking

10. While the Delawares' interest vis-a-vis the Caddos' cross-claim was apparently identical to the Wichitas', the Delawares were never made parties to the suit either. Nor could they have been made parties, given their own tribal immunity. That they, at one point, conceded that the District Court had jurisdiction over the cross-claim and opted to file an answer to the cross-claim even though they had neither been named nor intervened, *see* Answer of Delaware Tribe to Cross-Claim of Caddo Tribe, Record No. 32, still does not satisfy the requirement of an explicit consent to be sued before we will find a waiver of tribal immunity. *See supra* at 775–76.

11. The United States now argues that the IBIA erred in holding that the Caddos had agreed to the distributions during the entire post-1966 period. The government asks that we remand the claim to the IBIA and hold that the Caddos only agreed to the distributions through 1978. *See* Brief for the Federal Cross-Appellees at 10–11 ("Upon further review, the Department of the Interior has concluded that the record, as it stands, does not show a mutual agreement in the period following the last joint resolution to divide the income equally.").

input into the cross-claim litigation. *Cf. Ilan-Gat Engineers Ltd. v. Antigua International Bank*, 659 F.2d 234, 242 (D.C.Cir. 1981) ("a court should 'in equity and good conscience,' consider the time of the motion ... in weighing the prejudice to the moving party").

Finally, we reject the notion that the Wichitas' ability to intervene as defendants in the cross-claim, as the Caddos and Delawares did vis-a-vis the original claim, mitigated the prejudice of proceeding in their absence. To intervene, the Wichitas would have had to waive their tribal immunity. It is wholly at odds with the policy of tribal immunity to put the tribe to this Hobson's choice between waiving its immunity or waiving its right not to have a case proceed without it.

### 2. *Ability to Shape Remedy to Avoid Prejudice*

This is not a case where we can shape the relief so as to avoid the prejudice to the absent parties. Unlike a case where the problem is simply the potential depletion of a fund, *see, e.g., Provident Tradesmen Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), and the court can thus protect the absent party by shielding an adequate portion of the fund until all third parties have an opportunity to bring claims, any relief that the Caddos obtain in this case will have an inevitable effect on the Wichitas and Delawares. Simply because a number of parties harbor an interest in obtaining a specified *quantity* of pie, does not necessarily mean that their claims are conflicting. There *may* be more than enough pie to satisfy all of the claims, and the interests are therefore *not always* mutually exclusive. *Provident Tradesmen* was such a case. *See id.* at 115–16, 88 S.Ct. at 741. But when, as in this case, the parties' interest is in a specified *percentage* of the pie, and the combined requests of the parties exceed 100% of the pie, the court cannot afford one relief without affecting the rights of the others. In that instance, the claims are mutually exclusive, and the problem of indispensability of an absent party is accentuated.

Of course, were we to accept the Caddos' argument that the IBIA erred in finding that the Caddos had consented to the pre-1982 distribution scheme, we could limit our remedy to a remand to the IBIA for renewed consideration. On remand, the Wichitas would undoubtedly have an opportunity to participate in the proceedings. But while a remand might be a bit less prejudicial than a judgment ordering immediate redistributions, there would still be substantial prejudice to the Wichitas. Unlike a case where the remand is for reevaluation in light of a procedural defect, a remand in this case would be premised on a holding that the agency made a substantive mistake in finding that the Caddos had agreed to the distribution scheme through 1982. Our holding to that effect would be binding on the agency, and it becomes quickly obvious that even if we were to agree with the substantive premise of the remand solution, it would not in fact mitigate the prejudice to the Wichitas.

Nor does it suffice to say that the court could stay future disposition of the funds until the absent party-tribes have an opportunity to file a separate suit challenging any distribution plan that the court endorses. It would elevate form over substance to allow tribal immunity to be avoided by proceeding against an absent, indispensable, tribe because the tribe has the opportunity to file a later suit attacking the plan. This is tantamount to saying that there is no prejudice because the tribe has the right to intervene, a conclusion we have already rejected. *See supra* p. 776. Either approach dismisses substantially the policy of tribal immunity, which, after all, accords to tribal sovereignty and autonomy a place in the hierarchy of values over society's interest in making tribes amenable to suit. *Cf. United States Fidelity*, 309 U.S. at 513, 60 S.Ct. at 657 ("the desirability for complete settlement of all issues between parties must, we think, yield to the principle of immunity").

### 3. Adequacy of Judgment

█ The third factor, "whether a judgment rendered in the person's absence will be adequate," tends to point in favor of finding that the tribes were not indispensable parties. Inasmuch as the federal defendant has control of the trust, and the relief that the Caddos seek in reallocation of future distributions to compensate for past withholdings is not dependent on compliance by the other two tribes, a judgment rendered in their absence would be effective. This factor, however, cannot be given dispositive weight when the efficacy of the judgment would be at the cost of the absent parties' rights to participate in litigation that critically affect their interests.

### 4. Alternative Adequate Remedy

█ The final factor that Rule 19(b) mentions is "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." While a court should be extra cautious in dismissing a case for nonjoinder where the plaintiff "will not have an adequate remedy elsewhere," *Park v. Didden*, 695 F.2d 626, 631 n. 13 (D.C.Cir.1982), it is also important to realize that "[t]his does not mean that an action should proceed solely because the plaintiff otherwise would not have an adequate remedy, as this would be a misconstruction of the rule and would contravene the established doctrine of indispensability." 3A Moore's Federal Practice ¶ 19.07–2[4], at 19–153 (1984).

Although we are sensitive to the problem of dismissing an action where there is no alternative forum,[12] we think the result is less troublesome in this case than in some others. The dismissal of this suit is mandated by the policy of tribal immunity. This is not a case where some procedural defect such as venue precludes litigation of the case. Rather, the dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.[13]

In light of the foregoing factors, we conclude that the Wichitas and Delawares were indispensable parties to the cross-

**12.** The Wichitas have suggested that the Caddos have an alternative of pursuing an action directly against the government for damages under the Tucker Act, in the United States Claims Court. *See Mitchell v. United States,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Indian tribe may sue under Tucker Act for breach of statutorily defined trust); *but see Mitchell v. United States,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (no cause of action under Tucker Act where statute regarding Indian land created only "limited trust"). It is possible, however, that such a suit would also be barred under Rule 19, because the government, if held liable, would be entitled to offset the payments from the other tribes *unless* the tribes could demonstrate that they "ha[ve] so changed [their] position that it is inequitable to compel [them] to make repayment." *Restatement (Second) of Trusts* § 254 (1959). As this court has explained, "when a trustee overpays a beneficiary the trustee is entitled to recover the excess payment, even when it was the product of unilateral mistake on the part of the trustee" except that in some cases of detrimental reliance "the beneficiary is entitled to retain part or all of the overpayment to the extent necessary to avoid injustice." *Hoffa v. Fitzsimmons,* 673 F.2d 1345, 1354 & n. 27 (D.C.Cir.1982); *see also* G. Bogert, *Trusts & Trustees* § 814 (rev. 2d ed. 1981). Given this principle, litigation against the government would clearly affect the absent tribes. Whether a Claims Court action would in fact be barred by Rule 19 is, of course, left for the United States Claims Court to decide if the Caddos initiate an action there. We point out the problem only to show why we cannot rely on such a suit as an obviously available alternative that mitigates the effect of our dismissal.

**13.** In *Provident Tradesmens Bank v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), the Supreme Court explained that "the decision whether to dismiss ... must be based on factors varying with different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests." *Id.* One leading commentator has suggested that when a necessary party is immune from suit, there is very little room for balancing of other factors, since this "may be viewed as one of those interests 'compelling by themselves.'" 3A *Moore's Federal Practice* ¶ 19.15, at 19–266 n. 6 (1984); *see also* Wright & Miller, *Federal Practice and Procedure* § 1617, at 172 (1972) ("No doubt because of the sovereign immunity concept, the application of Rule 19 in cases involving the government reflects a heavy emphasis on protecting its interests.").

claim.[14] This conclusion is consistent with the position that the Caddos and Delawares took in the District Court when they intervened arguing that the three tribes were all indispensable to the litigation. *See supra* p. 771. Since the Wichitas and Delawares did not waive their immunity vis-a-vis the cross-claim, they could not be joined as parties, and the cross-claim should have been dismissed.

### III. THE SUBSTANCE OF THE WICHITAS' CLAIMS

#### A. *Choice of Distribution Plan*

■ We agree with the District Court's grant of summary judgment in favor of the government and against the Wichitas on the issue of whether future distributions may be based on current population figures. The Wichitas argued to the court that the income should be divided equally among the three tribes or, alternatively, that it should be based on 1891 tribal population figures. As for the 1891 date, the IBIA reasonably determined that the purpose of the restorations was to invigorate *current* tribes, not to confer benefits on individual Indians according to the status of their ancestors as members of a now extinct tribe. There is much support for this proposition in the legislative history of the Indian Reorganization Act. *See, e.g.*, S.Rep. No. 1080, 73d Cong., 2d Sess. 1 (Act sought to stop alienation of lands that "are needed for *present and future support* of these Indians") (emphasis added); *see generally Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973) ("The intent of the IRA was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'") (quoting H.R.Rep.

No. 1804, 73d Cong., 2d Sess. 6 (1934)). Given this emphasis on present-day needs of current tribes, choice of the 1891 date as a fulcrum for distribution would clearly have been inappropriate. Indeed, the Wichitas appear to have largely abandoned that argument on appeal.

■ Similarly, we agree with the District Court that, given the language and contemporaneous construction of the 1963 restoration order, it cannot be said that population-based distributions, as opposed to equal distributions, are unreasonable ways of implementing the restoration orders. Having determined that the goal of the restorations was to invigorate current tribes, it was certainly sensible to distribute the funds in a way that would give the larger tribes more. This conclusion is buttressed by the high level of deference to be afforded an agency on review when the issue turns on the interpretation of the agency's own prior proclamations. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980) (agency's construction of its own regulations especially due respect); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (an agency's construction of its own regulation is entitled to even more deference than an agency's construction of its own statute); *United Municipal Distributors Group v. FERC*, 732 F.2d 202, 208 (D.C.Cir.1984) (same).

The crux of the Wichitas' argument on appeal is that the District Court afforded too much deference to the agency. The Wichitas argue that the precedents mandating a "hard look" at dramatic changes in agency policy are implicated here, since

---

**14.** We emphasize the limited nature of our holding that review otherwise available under the Administrative Procedure Act may be unavailable due to the impossibility of joining an indispensable party. First, the problem is not implicated with regard to the sovereign immunity of the United States since 5 U.S.C. § 702 provides that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to

act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States *or that the United States is an indispensable party.*" (emphasis added).

Moreover, with regard to tribal immunity, it is the unique fact that the suit directly implicates a third-party tribe, and that the government's involvement in the case cannot be said to fully protect the absent tribe's interests that mandates the result we reach.

there was a 15-year history of equal distributions to each tribe. We reject this argument. As the IBIA and District Court found, there has been no change whatsoever in basic agency policy with regard to the population-based versus equal distribution issue. The Department continuously maintained that it would not interfere as long as the tribes could agree on a distribution scheme, but that if the tribes could not agree it considered a population-based scheme as the only viable route.[15] *See supra* pp. 768–69. Only when tribal agreement broke down did the Department step in, and at that time it proposed the same population-based distribution plan that it had supported since the restoration order. *See supra* pp. 769–70. The first 15 years of the restoration order should, therefore, not be characterized as agency endorsement of an equal distribution interpretation, but rather as acquiescence in a self-determination policy that allowed the tribes to deal with the issue on their own.

We think the Wichitas misconstrue the IBIA's distribution plan as violating the principle that tribal lands are to be held in trust for tribes, not for individual Indians. Wichita Brief at 22–23. The Wichitas point to cases holding that individual Indians may not "claim a pro-rated proportion of the proceeds of sales" made on behalf of a tribe, *Cherokee Trust Funds*, 117 U.S. 288, 308, 6 S.Ct. 718, 727, 29 L.Ed. 880 (1886), and that "[n]o individual Indian has title or an enforceable right in tribal property." *Holt v. CIR*, 364 F.2d 38, 41 (8th Cir.1966), *cert. denied*, 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967). Certainly, if the Department and IBIA had decided to distribute the land or its proceeds to each individual Indian member of the tribes, the Wichitas' citations would be relevant. But in this case there is no such proposal; everyone concedes that the tribal distributions

are to go to the tribes. The only question is how much each *tribe* should get.

The Wichitas also argue that the IBIA's determination is contrary to settled trust law which provides that where a conveyance "is made to two or more persons, and the instrument is silent as to the interest which each is to take, the presumption will be that their interests are equal." *Loring v. Palmer*, 118 U.S. 321, 341, 6 S.Ct. 1073, 1080, 30 L.Ed. 211 (1886); *see also Healing v. Jones*, 210 F.Supp. 125 (D.Ariz.1962) (conveyance to Hopi and Navajo tribes resulted in joint, undivided and equal ownership notwithstanding disparity in sizes of tribes), *aff'd*, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.22d 703 (1963). The fact is, however, that in this case only one entity was actually listed: Wichita and Affiliated Bands of Indians. The order then explained, in a parenthetical, that the Affiliated Bands are today comprised of the Caddos and Delawares. The difficulty then is not in determining what percentage of the tribal income the listed entity should receive—all agree that it receives 100%—rather, the problem is deciding in what proportion the entity's successor tribes should receive the benefits of the trust.

The conveyance rule that the Wichitas refer to affords a presumption for ambiguous situations that the grantor wishes each of the named recipients to share equally. *Cf. Restatement (Second) of Trusts* § 128 (1959) ("The extent of the interest of a beneficiary of a trust depends upon the manifestation of intention of the settlor"). Such a presumption, however, is of no avail in determining whether a grantor wanted each of the recipient's successors to receive an amount based on its relative population, or to receive a third of the fund's proceeds no matter how small the tribes' population might be. The Department and the IBIA

---

15. As the Field Solicitor wrote:

> The Bureau of Indian Affairs, I am sure, will go along with any arrangement which is mutually agreeable to the three tribes. It was for that reason that, despite the language of Secretary Carver's letter, the Anadarko Agency interposed no objection to the adoption of the

> current practice which provides for management representation and sharing of benefits upon an equal Tribal basis rather than an equal individual basis.

Letter to Caddo tribe, dated Sept. 10, 1970, Admin.Rec. No. 31, ex. F.

decided that, given the IRA's paramount thrust of strengthening tribal life, distributions should be made so that the tribes with larger populations, and presumably larger expenses, would get a larger percentage of the income than smaller tribes, with presumably smaller expenses. This determination was clearly reasonable under tenets of administrative law, as well as trust law. We therefore affirm the District Court's grant of summary judgment against the Wichitas on their claim that allocations must be made equally among the tribes.

### B. *The Nonadjustment Decision*

Finally, the Wichitas challenge the Assistant Secretary's decision to freeze the population percentages as of July 30, 1982, instead of undertaking periodic reevaluations. The Wichitas argue that selection of any one date as the determinant of all future allocations, purportedly based on a current population formula, is inherently unreasonable. We need not review the reasonableness of the decision, however, because we find that the Assistant Secretary's decision not to undertake readjustments was in direct contravention of the IBIA's order.

Although the IBIA declined to fashion a specific plan for determining population,[16] it clearly envisioned that the population figures would fluctuate, and undergo reevaluation, over time. The IBIA ruled that "[d]ivision of current and future funds should be based on current relative populations of each tribe *at the time the funds accrue.*" 10 I.B.I.A. at 52 (emphasis added). Nothing in that decision authorizes the Department to adopt one specific date for all future disbursements and to refuse to make further adjustments notwithstanding any future deviations in popu-

lation figures. The Assistant Secretary may be correct in his concern that periodic readjustments could give rise to membership-enhancing strategies on the part of the tribes, but he has never formally challenged the IBIA's decision on that basis. Absent such a challenge, the Department is bound by the IBIA decision to adopt a plan for ensuring that the distributions are somehow related to the actual population "at the time the funds accrue." *See* 43 C.F.R. §§ 4.312–4.316 (discussing finality of IBIA rulings, petitions for reconsideration, and procedure for appeal). Thus, we reverse the District Court to the extent that it affirmed the Assistant Secretary's decision not to undertake readjustments. Summary judgment on that issue should be awarded in favor of the Wichitas.

### CONCLUSION

Once the 15 year agreement among these three tribes fell through, and the Department of Interior was forced to intervene and impose a solution, there were bound to be winners and losers. The fact that each of the three tribes has been both a plaintiff and a defendant at one or another point in the administrative or judicial proceedings here, evidences the no-win situation in which the Department found itself. We find the IBIA's current population-based allocation decision was a reasonable and basically just solution to a difficult problem, and the District Court correctly granted summary judgment in the government's behalf.

The Department disturbed this fine balance, however, when it swayed from the IBIA's ruling and decided that it would take no account of population shifts in the future. We reverse the District Court's grant of summary judgment on that account. Finally, the doctrine of tribal immu-

---

**16.** The Board stated:

Appellant has asked the Board to fashion a plan for ascertaining the exact populations of each tribe, and to schedule periodic reviews of the plan for division of funds. It is not a proper function of this Board to devise and direct a detailed plan for administration of the income fund. The jurisdiction of this Board is limited to decision of legal disputes within the Board's competence as defined by Departmental regulation. Matters of policy and administration are, for practical as well as legal reasons, outside the area in which the Board is designed to function.

10 I.B.I.A. at 44–45.

nity compels us to dismiss the Caddos' claim for future redistribution to take account of past withholdings. Immunity doctrines inevitably carry within them the seeds of occasional inequities; in this case the Wichitas have used the courts as both a sword and shield. Nonetheless, the doctrine of tribal immunity reflects a societal decision that tribal autonomy predominates over other interests. Accordingly, the judgment of the District Court is

*Affirmed in part, reversed in part, and vacated in part.*

