117 F.3d 1489
 326 U.S.App.D.C. 139, 38 Fed.R.Serv.3d 58
 CHEROKEE NATION OF OKLAHOMA, On behalf of its members, Appellant
v.
Bruce BABBITT, In his official capacity as Secretary of
Interior of the United States Department of Interior and Ada
E. Deer, In her official capacity as Assistant Secretary of
the Department of the Interior, Appellees.
 No. 96-5337.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 6, 1997.
Decided July 15, 1997.
 
 [326 U.S.App.D.C. 141] Appeal from the United States District Court for the District of Columbia (No. 96cv02284).
 James Hamilton argued the cause for appellant, with whom William J. Mertens and Robert V. Zener, Washington, DC, were on the briefs.
 Edward J. Shawaker, Attorney, U.S. Department of Justice, argued the cause for appellees, with whom Lois J. Schiffer, Assistant Attorney General, and Robert L. Klarquist, Attorney, Washington, DC, were on the brief.
 Jill E. Grant, Washington, DC, argued the cause and filed the brief for amicus curiae Delaware Tribe of Indians.
 [326 U.S.App.D.C. 142] Before: HENDERSON, ROGERS and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROGERS.
 ROGERS, Circuit Judge:
 
 
 1
 The Cherokee Nation of Oklahoma appeals from the dismissal, pursuant to Fed.R.Civ.P. 19(b), of its complaint challenging a Final Decision by the Department of the Interior extending formal recognition to the Delaware Tribe of Indians. It contends that the district court erred in ruling that the Delaware Tribe is a necessary and indispensable party that cannot be joined because it has sovereign immunity. The Cherokee Nation maintains that the Delawares do not have sovereign immunity because they were "incorporated" into the Cherokee Nation pursuant to an 1866 treaty and a subsequent agreement between the two tribes. We hold that the district court erred in concluding that the Delawares can assert sovereign immunity in this lawsuit, and reverse.
 
 I.
 
 2
 The history of the migration of the Delawares from what is now the northeastern part of the United States to the State of Oklahoma is set forth in Delaware Tribal Bus. Comm. v. Weeks, 430 U.S. 73, 75-77, 97 S.Ct. 911, 914-15, 51 L.Ed.2d 173 (1977). For our purposes, it suffices to observe that over time the Delawares were repeatedly forced westward and fragmented into separate groups. The main body of the tribe settled in Kansas under the terms of an 1829 treaty between the Delawares and the United States. Treaty of 1829, 7 Stat. 327; Weeks, 430 U.S. at 76, 97 S.Ct. at 914-15. Although that Treaty contemplated the establishment of a "permanent residence" for the Delawares to be "forever secured" by the United States, the Delawares were soon forced to move again. In 1866, the Delawares entered into a new treaty under which their land in Kansas would be sold to a railroad company and the United States would find new land for them in the Indian Territory, which is now the State of Oklahoma. Treaty of 1866, 7 Stat. 793, 794; Weeks, 430 U.S. at 77, 97 S.Ct. at 915. This Treaty of 1866 also permitted any Delawares who wished to remain in Kansas to sever their relations with the tribe and become citizens of the United States.[1] 7 Stat. 794. It is the legal status of the Delawares who moved to Oklahoma pursuant to the 1866 treaty (and their descendants) that is at issue in this litigation.
 
 
 3
 Shortly after the Treaty of 1866 with the Delawares was concluded, the United States entered into a Treaty with the Cherokee Nation, which resided in the Indian Territory.[2] Treaty of 1866, 14 Stat. 799 (1866). Article 15 of this second Treaty of 1866 provided that:
 
 
 4
 The United States may settle any civilized Indians, friendly with the Cherokees and adjacent tribes, within the Cherokee country, on unoccupied lands east of 96? , on such terms as may be agreed upon by any such tribe and the Cherokees, subject to the approval of the President of the United States, which shall be consistent with the following provisions, viz: [FIRST:] Should any such tribe or band of Indians settling in said country abandon their tribal organization, there being first paid into the Cherokee national fund a sum of money which shall sustain the same proportion to the then existing national fund that the number of Indians sustain to the whole number of Cherokees then residing in the Cherokee country, they shall be incorporated into and ever after remain a part of the Cherokee Nation, on equal terms in every [326 U.S.App.D.C. 143] respect with native citizens. [SECOND:] And should any such tribe, thus settling in said country, decide to preserve their tribal organizations, and to maintain their tribal laws, customs, and usages, not inconsistent with the constitution and laws of the Cherokee Nation, they shall have a district of country set off for their use by metes and bounds equal to one hundred and sixty acres, if they should so decide, for each man, woman, and child of said tribe, and shall pay for the same into the national fund such price as may be agreed on by them and the Cherokee Nation, subject to the approval of the President of the United States, and in cases of disagreement the price to be fixed by the President.
 
 
 5
 And the said tribe thus settled shall also pay into the national fund a sum of money, to be agreed on by the respective parties, not greater in proportion to the whole existing national fund ... than their numbers bear to the whole number of Cherokees then residing in said country, and thence afterwards they shall enjoy all the rights of native Cherokees....
 
 
 6
 Id. at 803-804.
 
 
 7
 In 1867, the Delawares entered into an Agreement with the Cherokee Nation. Under that Agreement the Cherokee Nation agreed to "sell to the Delawares, for their occupancy, a quantity of land ... in the aggregate equal to 160 acres for each individual of the Delaware tribe" who moved to Oklahoma. The Delawares, in turn, agreed to pay the Cherokee Nation $1 per acre for this land, and "a sum of money which shall sustain the same proportion to the existing Cherokee national fund that the number of Delawares ... removing to the Indian country sustains to the whole number of Cherokees residing in the Cherokee Nation." In addition, the Cherokee Nation and the Delawares agreed that:
 
 
 8
 On the fulfillment by the Delawares of the foregoing stipulations, all the members of the tribe registered, as above provided, shall become members of the Cherokee Nation with the same rights and immunities, and the same participation (and no other) in the national funds, as native Cherokees save as hereinbefore provided.
 
 
 9
 And the children hereafter born of such Delawares so incorporated into the Cherokee Nation shall in all respects be regarded as native Cherokees.
 
 
 10
 Pursuant to the two Treaties of 1866 and the 1867 Agreement, most of the Delawares moved to Cherokee territory "where they were gradually assimilated for most purposes into the Cherokee Nation...." Weeks, 430 U.S. at 77, 97 S.Ct. at 915.[3]
 
 
 11
 Although the 1867 Agreement provided that the Delawares would be "incorporated into the Cherokee Nation" and enjoy "the same rights and immunities ... as native Cherokees," conflicts developed between the two groups. In 1890, the Delawares sued the Cherokee Nation for a share of the proceeds from the rental of certain Cherokee land. In Cherokee Nation v. Journeycake, 155 U.S. 196, 15 S.Ct. 55, 39 L.Ed. 120 (1894), the Supreme Court reviewed the 1867 Agreement and Article 15 of the 1866 Treaty with the Cherokee Nation, concluding that the Delawares had "become incorporated into the Cherokee Nation and are members and citizens thereof," and that it "follow[ed] necessarily that they are, equally with the native Cherokees, the owners of, and entitled to share in the profits and proceeds of, [Cherokee] lands." Id. at 211, 15 S.Ct. at 60. The Court did not expressly rule on whether the Delawares had settled in Cherokee territory under the first or the second provision of Article 15, but it did state that the 1867 Agreement made "no provision for the setting apart of a distinct body of land in any portion of the reservation for the Delaware Tribe...." Id. at 205, 15 S.Ct. at 59. In 1904, the Delawares again sued the Cherokee Nation, pursuant to a special Act of Congress,[4] seeking a declaration of their rights in the land they acquired under the 1867 Agreement. In Delaware Indians v. Cherokee Nation, [326 U.S.App.D.C. 144] 193 U.S. 127, 24 S.Ct. 342, 48 L.Ed. 646 (1904), the Supreme Court held that the Delawares did not acquire any permanent interest in these lands that could be passed on to their descendants, but only the right to use and occupy these lands during their lifetimes; any children of the Delawares born after the move to Oklahoma "took only the rights of other citizens of the Cherokee Nation, as the same are regulated by its laws." Id. at 143, 24 S.Ct. at 348.
 
 
 12
 Notwithstanding the 1867 Agreement and the Supreme Court decisions, the Delawares continued to maintain a distinct group identity separate from the Cherokee Nation. See Weeks, 430 U.S. at 77, 97 S.Ct. at 915. In 1940, the Department of the Interior acknowledged that the Delawares were entitled to organize as a tribe under the Oklahoma Indian Welfare Act, concluding that "although for certain administrative purposes, the Cherokee Nation in which the Delawares ... and others were amalgamated was recognized as of [sic] a single tribe, the national or tribal character of the Delaware-Cherokees was never lost or completely merged into that of the Cherokees."[5] In 1958 the Department convened a general meeting at which the Delawares elected a business committee and adopted formal bylaws, which the Department approved in 1962. Yet, according to an affidavit filed by the Cherokee Nation, the Delawares also continued to participate in the Cherokee government, voting in Cherokee elections and holding office on the Council of the Cherokee Nation.
 
 
 13
 On at least two occasions, Congress has recognized the Delawares as a distinct tribal entity, separate from the Cherokee Nation, for the purpose of distributing funds to compensate the tribe for injuries suffered prior to 1867. In 1904, Congress appropriated $150,000 to "the Delaware Tribe of Indians residing in the Cherokee Nation, as said tribe in council shall direct" as full payment of "all claims and demands of said tribe against the United States." Act of April 21, 1904, § 21, 33 Stat. 189, 222. In 1972, Congress enacted a formula for the distribution of approximately $9 million awarded by the Indian Claims Commission to the Delaware tribe for the United States' breach of an 1854 treaty. 25 U.S.C. §§ 1291-97. Under the statutory formula, the only Delawares eligible to share in the award were the "Cherokee Delawares," the descendants of those Delawares who had moved to Cherokee territory in 1867, and the "Absentee Delawares," a separate band of Delawares recognized by the Department as a distinct tribe.[6] Id. § 1292. In Weeks, the Kansas Delawares, descendants of those Delawares who remained in Kansas in 1867, challenged their exclusion under the statutory formula on the grounds that it denied them equal protection of the laws in violation of the Due Process Clause of the Fifth Amendment. 430 U.S. at 75, 97 S.Ct. at 914. The Supreme Court rejected this argument, holding that Congress had a rational basis for the exclusion because the Kansas Delawares were not a recognized tribal entity and had previously severed their ties to the tribe, Congress had previously distinguished between the Kansas Delawares and the Cherokee-Delawares in the 1904 statute, and Congress was concerned with the administrative difficulty of including the Kansas Delawares. Id. at 85-89, 97 S.Ct. at 919-20. In reviewing the history of the Delawares, the Court observed that the Cherokee-Delawares "are today [in 1977] a federally recognized tribe." Id. at 77, 97 S.Ct. at 915.
 
 
 14
 In 1979, the Department repudiated the position, noted in Weeks, that the Delawares were an independent tribe, and advised that henceforth the Department would not maintain any government-to-government relationship with the Delawares. By letter of May 24, 1979, the Department stated that:
 
 
 15
 1. Based on the 1867 Agreement and related statutes, the Cherokee Delawares are a tribe within the Cherokee Nation. They are Cherokee citizens with the same responsibilities and privileges as other citizens of the Cherokee Nation.[326 U.S.App.D.C. 145] 2. The Cherokee Delawares may deal with their judgment awards and preserve their Delaware heritage and identity. For governmental purposes, however, they must look to the Cherokee Nation, of which they are an integral part.
 
 
 16
 Thus, from 1979 until the Final Decision of September 27, 1996, the Department declined to recognize the Delawares as a separate tribe.
 
 
 17
 In 1992, the Delawares advised the Department of their intent to petition for recognition as an Indian tribe pursuant to 25 C.F.R. Part 83, which sets forth "departmental procedures and policies for acknowledging that certain American Indian groups exist as tribes." 25 C.F.R. § 83.2 (1996); see also id. §§ 83.4, 83.6. In 1994, the Department responded that it would not consider such a petition because Congress had already defined the relationship between the Delawares and the Cherokee Nation. Based on the language of the 1867 Agreement, the relevant treaties, and the Supreme Court's decisions in Journeycake and Delaware Indians, the Department stated, "[i]t is the position of the Department of the Interior that the Cherokee Delawares have not existed as an independent political entity since 1867, and have been absorbed into the Cherokee Nation of Oklahoma for general governmental purposes since that time."
 
 
 18
 The Delawares requested reconsideration and retraction of the 1979 letter, and after reviewing its relationships with the Delawares since 1867, the Department published a Notice of Intent to retract the 1979 letter. 61 Fed.Reg. 33,534, 33,534-35 (1996). Following comment by the Delawares and the Cherokee Nation, the Department issued a Final Decision on September 27, 1996, retracting the 1979 letter and recognizing the Delawares as a "separate sovereign" with "the same legal rights and responsibilities as other tribes, consistent with federal law, both as to jurisdiction and as to its right to define its membership." 61 Fed.Reg. 50,862, 50,863 (1996). Thereafter, the Department included the Delawares on the list of federally recognized tribes published in the Federal Register. 61 Fed.Reg. 58,212 (1996).
 
 
 19
 The Cherokee Nation filed the instant lawsuit, seeking review of the Final Decision under the Administrative Procedure Act. 5 U.S.C. §§ 551-99 (1996). The complaint alleged that the Final Decision was arbitrary and capricious because the Department failed to follow the Part 83 regulations governing tribal recognition, and was contrary to applicable law, including the Treaty of 1866 with the Cherokee Nation, the 1867 Agreement between the Cherokee Nation and the Delawares, and the Supreme Court's decisions in Journeycake and Delaware Indians.[7] The named defendants, the Secretary of the Interior and the Assistant Secretary for Indian Affairs, moved to dismiss the complaint pursuant to FED.R.CIV.P. 19(b) for failure to join an indispensable party, the Delaware Tribe. The district court granted the motion, ruling that the Delawares had sovereign immunity and that they were a necessary and indispensable party. Although the district court concluded, based on Journeycake and Delaware Indians, that the Delawares had settled in Cherokee territory pursuant to the first provision of Article 15 of the 1866 Treaty with the Cherokee Nation, the court rejected the argument that the 1867 Agreement waived the Delawares' sovereign immunity. Interpreting the Supreme Court in Weeks to have "found" that the Delawares were a distinct Indian tribe, the district court further concluded that the Delawares are still a "tribe" that, in the absence of an express waiver, was entitled to assert sovereign immunity. The Cherokee Nation appeals the dismissal of the complaint; the Delawares appear as amicus curiae in support of the Department.
 
 II.
 
 20
 Rule 19 of the Federal Rules of Civil Procedure establishes a two-step procedure for determining whether an action must [326 U.S.App.D.C. 146] be dismissed because of the absence of a party needed for a just adjudication.[8] First, the court must determine whether the absent party is "necessary" to the litigation according to factors enumerated in Rule 19(a); if so, the court must order that the absent party be joined. If a necessary party cannot be joined, the court must turn to the second step, examining the factors in Rule 19(b) to "determine whether in equity and good conscience, the action should proceed among the parties before it, or should be dismissed, the absent person being regarded as indispensable." FED.R.CIV.P. 19(b). The district court concluded that the Delawares were a necessary party, that they had sovereign immunity and could not be joined, and that the lawsuit could not proceed in their absence.[9] The Cherokee Nation contends that the Delawares cannot assert sovereign immunity in this lawsuit, that the Delawares are not indispensable because the Department can adequately represent their interest in defending the Final Decision, and that, in any event, the public interest exception to Rule 19 applies.
 
 
 21
 Whether a group constitutes a "tribe" is a matter that is ordinarily committed to the discretion of Congress and the Executive Branch, and courts will defer to their judgment. United States v. Holliday, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865); James v. United States Dept. of Health and Human Serv., 824 F.2d 1132, 1137 (D.C.Cir.1987). Although the principle of deference does not require a court to avoid the question of sovereignty, "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 60, 98 S.Ct. 1670, 1678, 56 L.Ed.2d 106 (1978). For reasons consistent with our recognition in James that the expertise on tribal recognition resides elsewhere, 824 [326 U.S.App.D.C. 147] F.2d at 1138, we examine first whether other grounds exist to resolve the instant appeal, without reaching the question of whether the Delawares are a tribe with an identity and sovereignty separate from that of the Cherokee Nation. Treating the Cherokee Nation's contentions in reverse order, we conclude first thatRule 19 cannot itself be avoided by applying the public interest exception, described in Kickapoo Tribe v. Babbitt, 43 F.3d 1491, 1500 (D.C.Cir.1995). The issues presented, although of considerable importance to the Delawares and the Cherokee Nation, and to a lesser extent to the Department, do not require the joinder of a large number of persons whom it is infeasible to join in the lawsuit. The particular issues do not involve a matter of the type of "transcending importance" for which the exception has previously been invoked. Id. (citations omitted). Essentially, the dispute involves rights to federal benefits, or, more expansively, the relationship between two groups and their respective relationships with the federal government. While issues of sovereignty are fundamental in nature, as narrowly posed here between two groups, there is simply no necessity requiring invocation of an exception to Rule 19.
 
 
 22
 Turning to the first step in the Rule 19 analysis, we conclude second, that the Department cannot adequately represent the Delawares. Although the Ninth Circuit has held that "[i]n disputes involving intertribal conflicts, the United States cannot properly represent any of the tribes without compromising its trust obligation to all tribes," Quileute Indian Tribe v. Babbitt, 18 F.3d 1456, 1460 (9th Cir.1994); see also Confederated Tribes of the Chehalis Indian Reservation v. Lujan, 928 F.2d 1496, 1500 (9th Cir.1991); Makah Indian Tribe v. Verity, 910 F.2d 555, 560 (9th Cir.1990), this court has looked to whether there are additional indications that the United States' interests might diverge from those of the absent tribe or tribes. In Wichita & Affiliated Tribes v. Hodel, 788 F.2d 765 (D.C.Cir.1986), the court concluded that the United States could not adequately represent two absent tribes where there was a potential conflict between the tribes and the United States was "apparently willing to concede a large portion of [one tribe's] claim for retroactive relief." Id. at 775 & n. 11. Here, although the Delawares and the Department currently take the same position regarding the Delawares' sovereignty, and to that extent their interests are the same, the Department has twice reversed its position regarding the Delawares since 1940. Given the procedure used to reach the Final Decision at issue, the Department may reverse itself again. Moreover, even were the Department vigorously to represent the Delawares vis-a-vis the Cherokee Nation in the district court, the Department might decide not to appeal any unfavorable decision. As a non-party, the Delawares would have no right to appeal, regardless of whether the Department's decision was based on its view of the merits or on other considerations. Id. at 775. The Delawares' ability to participate as an amicus curiae is thus insufficient to protect their interests. Id.
 
 
 23
 The Cherokee Nation's reliance on Ramah Navajo School Bd. v. Babbitt, 87 F.3d 1338 (D.C.Cir.1996), is misplaced inasmuch as there was nothing in that case to indicate that the United States would to any degree abandon the position of the absent tribes as a group in favor of the position taken by the tribes before the court on the other side of the lawsuit. Cf. Wichita and Affiliated Tribes, 788 F.2d at 775 & n. 11. In Ramah, the absent Indian tribes were not necessary parties to a lawsuit challenging the Department's allocation of certain funds not only because they had no legally protected interest in the funds, 87 F.3d at 1351, but also because even if they had such an interest, the Department had no authority to give one of the absent tribes a greater share of the funds than another, id. at 1352, and thus had no conflicting obligations to the nonparty tribes. Absent such a convergence of interests between the Department and an absent tribe, particularly where the absent tribe's sovereignty is challenged, we find no abuse of discretion by the district court in concluding that the Delawares are indispensable.
 
 
 24
 Consequently, we must decide whether the district court erred in concluding that the Delawares are entitled to assert sovereign immunity. This is a question of [326 U.S.App.D.C. 148] law that the court reviews de novo. See Princz v. Federal Republic of Germany, 26 F.3d 1166, 1169 (D.C.Cir.1994), cert. denied, 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995). It is well established that "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." Santa Clara Pueblo, 436 U.S. at 55, 98 S.Ct. at 1675 (quoting Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)); FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 232 (1982). As sovereign entities that predate the establishment of the United States, they are immune from suit without their consent. Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. at 1676-77; see also Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 510, 111 S.Ct. 905, 909-10, 112 L.Ed.2d 1112 (1991). Tribal sovereign immunity does not derive from an act of Congress, but rather is one of the "inherent powers of a limited sovereignty which has never been extinguished." United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (citation omitted); see also Bottomly v. Passamaquoddy Tribe, 599 F.2d 1061, 1065 (1st Cir.1979). Unlike the sovereignty possessed by states and foreign nations, however, the sovereignty of Indian tribes is subject to the control of Congress, which has plenary authority to limit, modify, or eliminate tribal sovereign immunity. Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. at 1676-77; see generally U.S. CONST., art. I, § 8, cl. 3. Any waiver of a tribe's sovereign immunity, whether by Congress or by the tribe itself, "cannot be implied but must be unequivocally expressed." Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. at 1677 (citations omitted); Wichita and Affiliated Tribes, 788 F.2d at 773.
 
 
 25
 Not all groups, however, are "tribes" that are entitled to claim sovereign immunity or exercise the other prerogatives of sovereign powers. As noted, this is generally a matter for the other two branches of government to determine. Holliday, 70 U.S. (3 Wall.) at 419; James, 824 F.2d at 1137. Whatever difficulty courts may have encountered in determining whether Congress or the Executive Branch has recognized a group as a tribe was substantially reduced in 1978 when the Department promulgated procedures governing federal recognition of Indian tribes. See 25 C.F.R. Part 83 (1996). The Part 83 regulations provide that:
 
 
 26
 Acknowledgment of tribal existence by the Department is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes. Acknowledgment shall also mean that the tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes.
 
 
 27
 Id. § 83.2. Pursuant to these regulations, the Department periodically publishes in the Federal Register a list of all federally acknowledged tribes. Id. § 83.5(a).[10]
 
 
 28
 This court considered the effect of the Part 83 regulations in James. In that case, a group of Indians sued the Department, seeking an order that they be placed on the list of federally recognized tribes. 824 F.2d at 1135. A rival group of members from the same tribe had previously received federal recognition under the Part 83 regulations. Id. at 1136. The unrecognized group contended that it was not required to use the procedures under the Part 83 regulations because the federal government had previously recognized the tribe by including it in certain nineteenth-century lists. The court rejected this argument, holding that "[t]he purpose of the regulatory scheme ... would be frustrated if the Judicial Branch made initial determinations of whether groups have been recognized previously or whether conditions for recognition currently exist." Id. at 1137. Noting that the Department's special expertise in the area of tribal recognition "weighs in favor of giving deference to the agency," id. at 1138, the court held that it [326 U.S.App.D.C. 149] would require the unrecognized group to exhaust its administrative remedies. Id. at 1139.
 
 
 29
 Consistent with James, the inclusion of a group of Indians on the Federal Register list of recognized tribes would ordinarily suffice to establish that the group is a sovereign power entitled to immunity from suit. Cf. Holliday, 70 U.S. (3 Wall.) at 419. However, because the Delawares have been included on the most recent list as a result of the Final Decision now challenged by the Cherokee Nation, we conclude for several reasons that the Department's determination cannot be dispositive of the sovereign immunity issue in the instant appeal.
 
 
 30
 First, the Department did not follow the Part 83 regulations, but recognized the Delawares through the procedural device of retracting the May 24, 1979, non-recognition letter. An agency is required to follow its own regulations. Service v. Dulles, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957); Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir.1989). See Western Shoshone Business Council v. Babbitt, 1 F.3d 1052, 1057 (10th Cir.1993) (citing Edwards, McCoy & Kennedy v. Acting Phoenix Area Director, 18 I.B.I.A. 454, 457 (1990)). The notice and comment procedures used by the Department to retract the 1979 letter are not the same as Part 83 procedures, which, among other things, allow reconsideration by the Interior Board of Indian Appeals. 25 C.F.R. § 83.11 (1996). Nothing in the record reveals a finding by the Department pursuant to 25 C.F.R. § 1.2 (1996), whereby the regulations were waived "in the best interest of the Indians." Because the Delawares gave only notice of an intent to file a petition, moreover, use of Part 83 is not barred under 25 C.F.R. § 83.10(p) (1996), which precludes repetitioning after a denial of recognition.[11] See also 25 C.F.R. § 83.3(f) (1996).
 
 
 31
 Second, even assuming that the Part 83 regulations are not the exclusive means by which the Department may recognize tribes, the Final Decision on which the recent listing of the Delawares is based cannot itself be used to block review. The Cherokee Nation's complaint alleges that recognition of the Delawares is contrary to federal law, namely Article 15 of the Treaty of 1866 with the Cherokee Nation and the Supreme Court's decisions in Journeycake and Cherokee Nation. If the Department acted contrary to law, the Final Decision would be owed no deference. Finally, were the court to decline to review the district court's sovereign immunity ruling, then the Department's recognition decisions would be unreviewable, contrary to the presumption in favor of judicial review of agency action. See, e.g., Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135-36, 90 L.Ed.2d 623 (1986). While this presumption must sometimes give way where tribal sovereign immunity is at issue because "society has consciously opted to shield Indian tribes from suit without congressional or tribal consent," Wichita and Affiliated Tribes, 788 F.2d at 777; see also Kickapoo Tribe, 43 F.3d at 1499, that shield is available only when a group of Indians has been recognized as a sovereign by Congress, the Executive Branch, or the courts, and it is thus inappropriately invoked when tribal sovereignty is the ultimate issue. Cf. Native Village of Tyonek v. Puckett, 957 F.2d 631, 635 (9th Cir.1992).
 
 
 32
 Because reliance cannot be placed on the Department's recognition of the Delawares pursuant to the Final Decision, the court must itself decide whether the Delawares constitute a sovereign tribe. The Supreme Court has defined a "tribe" as "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory...." Montoya v. United States, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901). The parties do not appear to dispute that prior to 1867 the Delawares were a tribe by this definition, or that they were recognized as [326 U.S.App.D.C. 150] such by the United States.[12] The question is whether the 1867 Agreement effectively consolidated the Delawares into the Cherokee Nation and thereby ended their existence as a separate entity with respect to the Cherokee Nation. In answering this question, the court is bound by the Supreme Court's interpretation of that Agreement in Journeycake and Delaware Indians.
 
 
 33
 In Journeycake, the Supreme Court viewed a proper understanding of the 1867 Agreement to require reference to Article 15 of the Treaty of 1866 with the Cherokee Nation. 155 U.S. at 204, 15 S.Ct. at 59. As described by the Court, Article 15:
 
 
 34
 contemplated the settlement of other Indians within the limits of the Cherokee country east of the ninety-sixth degree of longitude, and provided for such settlement in two ways: One, in which the Indians settled should abandon their tribal organization, in which case, as expressed, they were to be "incorporated into, and ever after remain a part of, the Cherokee Nation on equal terms in every respect with native citizens." The other was where removal of the tribe to the Cherokee country should involve no abandonment of the tribal organization, in which case a distinct territory was to be set off, by metes and bounds, to the tribe removed. The one contemplated an absorption of individual Indians into the Cherokee Nation; the other a mere location of a tribe within the limits of the Cherokee reservation. If the removed Indians were to be absorbed into the Cherokee Nation, they were to be absorbed on equal terms in every respect with other citizens.
 
 
 35
 Id. at 204-05, 15 S.Ct. at 59. Neither Journeycake nor Delaware Indians explicitly addressed whether the Delawares settled in Cherokee territory pursuant to the first or the second provision of Article 15. The district court, however, relying on those cases, concluded that the Delawares settled in Cherokee territory pursuant to the first provision.
 
 
 36
 On its face, the language of the 1867 Agreement provides no clear indication as to which of the two Article 15 provisions applies. On the one hand, as noted in Journeycake, 155 U.S. at 205, 15 S.Ct. at 59, the 1867 Agreement did not require the Cherokees to set aside a distinct "district of country" for the Delawares to occupy. Instead, the Agreement referred to a "quantity of land ... in the aggregate equal to 160 acres for each member of the Delaware tribe ...." (emphasis added). Furthermore, the last two clauses of the 1867 Agreement provided that the Delawares would "become members of the Cherokee nation" and that the "children hereafter born of such Delawares so incorporated" would "be regarded as native Cherokees." Both considerations suggest that the Agreement was governed by the first provision of Article 15, whereby the settling tribe would lose its separate identity and be incorporated into the Cherokee Nation. On the other hand, as both the Delawares and the Department note, the Agreement also required the Delawares to make two payments to the Cherokees: one based on their population and a second for their land. This suggests that the parties intended the Agreement to be governed by the second provision of Article 15, whereby the settling tribe would maintain its separate identity.
 
 
 37
 Although the evidence of the Delawares' two payments is consistent with the second provision of Article 15, it turns out that there is reason to think that the two payments are not necessarily inconsistent with the first provision of Article 15. Simply put, the Delawares may have intended to give up their separate tribal existence, as required by the first provision, but negotiated a side agreement to ensure that they would have the same rights of occupancy in Cherokee land as native Cherokees. At the time, Cherokee land was not held by individual tribal members, but by the tribe as a whole. Journeycake, 155 U.S. at 207, 15 S.Ct. at 60. Cherokee law, however, permitted individual Cherokee to use certain lands for their personal [326 U.S.App.D.C. 151] occupation. Id. at 212, 15 S.Ct. at 60-61. Thus, the Delawares' second payment may have purchased a guarantee that they would receive an equal entitlement to the use of Cherokee land during their lifetimes, and not a right to maintain a separate existence as a tribe. The Supreme Court's language inJourneycake suggests that it viewed the second payment in this manner:
 
 
 38
 So far as the provision in the [A]greement for the purchase of homes is concerned, it will be perceived that no absolute title to these homes was granted. We may take notice of the fact that the Cherokees, in their long occupation of this reservation, had generally secured homes for themselves; that the laws of the Cherokee Nation provided for the appropriation by the several Cherokees of lands for personal occupation, and that this purchase by the Delawares was with the view of securing to the individual Delawares the like homes; that the lands thus purchased and paid for still remained a part of the Cherokee Reservation. And, as a further consideration for the payment of this sum for the purchase of homes, the Delawares were guaranteed not merely the continued occupancy thereof, but also that, in case of a subsequent allotment in severalty of the entire body of lands among the members of the Cherokee Nation, they should receive an aggregate amount equal to that which they had purchased, and such a distribution as would secure to them the homes upon which they had settled, together with their improvements....
 
 
 39
 155 U.S. at 212-213, 15 S.Ct. at 61; see also Delaware Indians, 193 U.S. at 139, 24 S.Ct. at 346-47. That the Delawares received only a lifetime entitlement to use and occupy the lands acquired under the 1867 Agreement, id. at 143, 24 S.Ct. at 344-45, also suggests that the second payment was not intended to guarantee a separate tribal existence. Hence, the fact of the second payment may be a doubtful basis from which to infer that the parties intended to be governed by the second provision of Article 15.
 
 
 40
 What is clear from the face of the 1867 Agreement and from Journeycake and Delaware Indians, however, is that the parties intended that the Delawares would be "incorporated" into the Cherokee Nation, and that their descendants would be regarded as Cherokee citizens. The ordinary meaning of "incorporate" is "to unite with ... something already existent ... so as to form an indistinguishable whole that cannot be restored to the previously separate elements...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1145 (1981). Although nothing in the Agreement prevented the Delawares from maintaining a separate cultural identity, "incorporation" is incompatible with the notion that they were to retain a separate governmental identity from the Cherokee Nation. The use of the term "incorporated" in the 1867 Agreement is sufficiently unambiguous to constitute an express relinquishment of the Delawares' status as a separate sovereign.
 
 
 41
 The alternative interpretations of the 1867 Agreement offered by the Delawares are unpersuasive. First, the Delawares note that the preamble to the 1867 Agreement refers to "a location of the Delawares upon the Cherokee lands, and their consolidation with the Cherokee Nation." They contend that the word "consolidation" suggests an alliance between two tribes, rather than the abandonment of one tribe's existence by incorporating into the other. In ordinary usage, however, "consolidate" means "to join together (as two or more items into one unit, or whole)." WEBSTER'S THIRD, supra, at 484. It is, therefore, quite similar in meaning to "incorporate." Second, the Delawares contend that the grant of Cherokee citizenship to the Delawares and their children is not inconsistent with the maintenance of a separate tribal existence. They maintain that these provisions were merely intended to prevent the Cherokees from discriminating against the Delawares. As the facts in Journeycake demonstrate, the Delawares may have had reason to fear that the Cherokee might not treat them as equal members of their society. But the Delawares point to nothing in the 1867 Agreement to suggest that the "incorporation" language was intended solely as an anti-discrimination clause. The Agreement contains no such language, but instead provides that the children of the Delawares "shall in all respects [326 U.S.App.D.C. 152] be regarded as native Cherokees." The plain meaning of this language is that the two tribes were to be consolidated into a single unit.
 
 
 42
 The fact that a tribe's sovereign immunity continues even after it has dissolved or abandoned its tribal government, United States v. United States Fidelity & Guar. Co., 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940), is, for our purposes, beside the point. The question of whether the district court erred does not turn on the abandonment of tribal institutions. As the Department notes, it does not appear that the Delawares ever abandoned their tribal institutions as a matter of practice. But the 1867 Agreement called for incorporation of one tribe into another. This represents a more radical disavowal of tribal identity than mere dissolution of governmental institutions, as was discussed in Fidelity. The parties have cited no authority to suggest that a sovereign tribe cannot, pursuant to authorization by Congress, relinquish its sovereignty and merge with another tribe, and it would be anomalous to hold that the two tribes each retained a separate governmental existence after such a merger.
 
 
 43
 Nor can we conclude that Congress' treatment of the Delawares after 1867 constituted recognition of the tribe as a distinct sovereign entity. Congress has recognized the Delawares as a distinct people on at least two occasions, in 1904 and 1972, for the purposes of distributing funds to redress the tribe for pre-1867 claims against the United States. Recognition of a tribe for the purpose of redressing historical claims, however, does not necessarily imply recognition of that tribe as separate political entity for other purposes. Congress has permitted any "identifiable group" to assert claims against the United States regardless of whether such a group constitutes a "tribe" or "band."[13] 28 U.S.C. § 1505; see Indian Claims Commission Act, Pub.L. 70-726, § 2, 60 Stat. 1049, 1050 (1946); see also Menominee Tribe of Indians v. United States, 179 Ct.Cl. 496, 388 F.2d 998, 1001 (1967), aff'd, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); COHEN, supra, at 12.
 
 
 44
 In concluding that the Delawares did retain sovereign immunity, the district court relied on the Supreme Court's statement in Weeks that the Delawares "are today a federally recognized tribe." 430 U.S. at 77, 97 S.Ct. at 915. Yet Weeks cannot be so broadly read as to resolve the issue in the instant appeal. Nothing in the Court's opinion suggests that it was revisiting its earlier conclusion in Delaware Indians and Journeycake that the Delawares had been "incorporated" into the Cherokee Nation. Rather, the Court simply summarized what it understood to be the government's position in that case. Nor does the holding in Weeks require the conclusion that the Supreme Court has recognized the Delawares as a sovereign tribe. Weeks was an equal protection case, addressing pre-1867 claims, in which the issue was whether Congress had a rational basis for excluding the Kansas Delawares from a distribution formula. Id. at 82, 85, 97 S.Ct. at 917-18, 919. So long as the government could articulate some reasoned explanation for the exclusion, the Court was required to uphold it. See Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); see also FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2100-01, 124 L.Ed.2d 211 (1993). The Court concluded that the exclusion was reasonable, based on historical practice, administrative convenience, and the fact that the Kansas Delawares chose to sever their relations with the tribe. Because it was not relevant, the Court did not address whether the Cherokee Delawares retained their separate existence as a sovereign tribe after 1867.
 
 
 45
 Even were the court to conclude that the Delawares settled in Cherokee territory pursuant to the second provision of Article 15 of the 1866 Treaty with the Cherokee Nation and retained their separate existence as a tribe, it would still be doubtful whether the Delawares could assert sovereign immunity against the Cherokee Nation. The second provision of Article 15 permitted a settling [326 U.S.App.D.C. 153] tribe to retain its "tribal laws, customs, and usages" only insofar as they were "not inconsistent with the constitution and laws of the Cherokee Nation." Thus, the Cherokee Nation was to retain "general jurisdiction ... over the territory occupied by the removed tribe." Journeycake, 155 U.S. at 205, 15 S.Ct. at 59. The Supreme Court distinguished this arrangement from Article 16, 14 Stat. 804, which provided for the settlement of tribes in Cherokee country west of 96? of longitude and the termination of Cherokee Nation jurisdiction.[14] Journeycake, 155 U.S. at 205, 15 S.Ct. at 59. The Department suggests that the relationship between the Cherokee Nation and the Delawares is analogous to the relationship between the United States and the individual States, which retain their sovereign status even though they are part of a greater whole. The Cherokee Nation responds that just as a State cannot assert sovereign immunity against the United States, United States v. Mississippi, 380 U.S. 128, 140, 85 S.Ct. 808, 814-15, 13 L.Ed.2d 717 (1965), the Delawares cannot assert sovereign immunity against the Cherokee Nation, of which they are a part. Whatever the merits of this argument, the principles governing the relationship between the federal government and the States do not automatically translate to other contexts. See, e.g., Reynolds v. Sims, 377 U.S. 533, 571-77, 84 S.Ct. 1362, 1386-90, 12 L.Ed.2d 506 (1964). In any event, the fact that the Delawares are part of the Cherokee Nation supports the conclusion that they cannot, at the very least, assert sovereign immunity in a lawsuit brought by the Cherokee Nation. A contrary interpretation would render the Cherokee "jurisdiction" over the Delawares illusory.
 
 
 46
 For these reasons, underscoring the doubts about the sovereign status of the Delawares in the face of agreement to incorporate the two tribes, we conclude that by entering into the 1867 Agreement the Delaware Tribe of Indians relinquished its tribal identity or sovereignty in relation to the Cherokee Nation. It is true that Congress has the authority to restore to the Delawares the separate sovereignty that the 1867 Agreement eliminated, and may delegate that authority to the Executive Branch. Federal policy has shifted over time,[15] and changes in the past 130 years might justify federal recognition of the Delawares, either by means of the Final Decision, the Part 83 regulations, or another method. It remains for the district court to determine the Cherokee Nation's challenge under the Administrative Procedure Act to the Final Decision of September 27, 1996, including whether the Delawares' tribal identity was properly revived by the Department in its Final Decision. Accordingly, we reverse the order dismissing the complaint and remand the case to the district court.
 
 
 
 [1]
 Congress passed several statutes naturalizing particular classes of Indians beginning in the 1870s. See, e.g., General Allotment Act of 1887 ("Dawes Act"), § 6, ch. 119, 24 Stat. 388, 390, codified as amended at 25 U.S.C. § 349. However, Congress did not extend citizenship to all native-born Indians until 1924. See 8 U.S.C. § 1401(b); see generally FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 639-42 (1982)
 
 
 [2]
 Like the Delawares, the "Five Civilized Tribes" (the Cherokee, Chickasaw, Choctaw, Creek, and Seminole) are not native to Oklahoma. The Five Civilized Tribes originated in what is now the southeastern portion of the United States, but were forced westward and settled in Oklahoma in the 1830s. See generally MURIEL H. WRIGHT, A GUIDE TO THE INDIAN TRIBES OF OKLAHOMA 4, 58-65 (9th prtg.1986)
 
 
 [3]
 The Delawares who moved to Cherokee territory, whom we refer to as "Delawares" are sometimes referred to as the "Cherokee Delawares," see Weeks, 430 U.S. at 77, 97 S.Ct. at 915, or the "Registered Delawares," see Delaware Indians v. Cherokee Nation, 193 U.S. 127, 143, 24 S.Ct. 342, 348, 48 L.Ed. 646 (1904)
 
 
 [4]
 Act of June 28, 1898, § 25, 30 Stat. 495
 
 
 [5]
 For ease of reference, we refer hereinafter to the Department of Interior, and any official or subdivision, including the Bureau of Indian Affairs, as "the Department."
 
 
 [6]
 The formal name of the "Absentee Delawares" is the Delaware Tribe of Western Oklahoma
 
 
 [7]
 The complaint also alleged that the Final Decision diminished the privileges and immunities of the Cherokee Nation in violation of 25 U.S.C. § 1212(4); violated the Interior and Related Agencies Appropriation Act of 1992, Pub.L. 102-154, 105 Stat. 990 (1991); impaired the Cherokee Constitution; and violated the United States' fiduciary and trust obligations to protect Cherokee sovereignty and tribal property
 
 
 [8]
 FED.R.CIV.P. 19 provides, in relevant part:
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest in the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party....
 (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent party being regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 
 
 [9]
 The Department suggests that the Cherokee Nation lacks prudential standing to challenge the department's failure to apply the Part 83 regulations on tribal recognition because it does not fall within the "zone of interests" protected by the regulations. See Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). The regulations define an "interested party" as:
 any person, organization or other entity who can establish a legal, factual, or other property interest in an acknowledgment determination and who requests an opportunity to submit comments or evidence or to be kept informed of general actions regarding a specific petitioner. "Interested party" ... may include, but is not limited to ... any recognized Indian tribes and unrecognized Indian groups that might be affected by an acknowledgment determination.
 
 
 [25]
 C.F.R. § 83.1 (1996). The Cherokee Nation has Article III standing because the Final Decision affects the authority of the Cherokee Nation over the Delawares and may affect its eligibility for certain federal funds. Thus, the Cherokee Nation has suffered an injury-in-fact that is fairly traceable to the Department's action and that can be redressed by an order invalidating the Final Decision. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992). Because the Cherokee Nation is also an "interested party" within the meaning of the Part 83 regulations, it has prudential standing, at least as to its claim that the Department acted contrary to law by failing to follow the regulations
 
 
 [10]
 Although Part 83 regulations require that the list be published no less frequently than every three years, 25 C.F.R. § 83.5(a) (1996), the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. § 479a-1 (1994), requires the list to be published annually
 
 
 [11]
 By letter of August 5, 1994, the Department, after responding to the Delawares' notice of intent to file a petition for recognition under Part 83, advised the Delawares, that they could file a "documented petition."
 
 
 [12]
 That the present-day Delawares are a "tribe" in the sense of being a distinct ethnic group sharing a common language, culture, and institutions, is not necessarily controlling because "Congress and the Executive have often departed from ethnological principles to determine tribes with which the United States would carry on political relations." COHEN, supra, at 5-6
 
 
 [13]
 By contrast, Congress has only permitted an "Indian tribe or band with a governing body duly recognized by the Secretary of the Interior" to assert federal jurisdiction under 28 U.S.C. § 1362
 
 
 [14]
 Article 16 of the 1866 Treaty with the Cherokee Nation:
 provided for taking a body of land out of this part of the Cherokee Reservation and removing it wholly from the jurisdiction of the Cherokee Nation, making a new reservation for the occupancy of the tribe to which it was conveyed; while in the case of Indians removed under the provisions of article 15, even though the tribal organization was preserved, the general jurisdiction of the Cherokee Nation over the territory occupied by the removed tribe was not disturbed.
 Journeycake, 155 U.S. at 205, 15 S.Ct. at 59.
 
 
 [15]
 See generally Reid Payton Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 STAN. L.REV. 1213 (1975)